COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO. 2085CV00758 B

```
                                          )
JANICE RITZ FISKE and                     )
DAVID FISKE                               )
                      Plaintiffs          )
v.                                        )        SECOND AMENDED COMPLAINT
                                          )
AXIS SPECIALTY EUROPE, SE                 )
                      Defendant           )
                                          )
```

### INTRODUCTION

This is an action brought by the Plaintiffs, Janice Ritz Fiske and David Fiske, against the Defendant insurance provider, Axis Specialty Europe, SE, for unfair claim settlement practices in violation of G.L. c.93A and G.L. c. 176D. The Plaintiffs' underlying claim involves substantial damages caused by the defective and negligent installation of a residential solar panel energy system by Defendant's insured at Plaintiffs' residence in Millbury, Massachusetts.

### PARTIES

1. The Plaintiffs, Janice Ritz Fiske and David Fiske, are husband wife, both residing at 4 Pineland Avenue, Millbury, Massachusetts (hereinafter collectively, the "Plaintiffs").

2. The Defendant, Axis Specialty Europe, SE ("Axis Specialty"), is a wholly owned subsidiary of Axis Capital Holdings Limited, with headquarters at 34 Upper Mount Street, Dublin, Ireland. At all times relevant, Axis Specialty insured Vivint Solar Developer, LLC ("Vivint") under a commercial general liability policy (Policy No. 3776500117EN) with a primary coverage limit of $1,000,000 per occurrence (the "Axis Policy"). A copy of the Certificate of Liability Insurance for the Axis Policy is attached hereto as **Exhibit A**.

3. Axis Specialty is sometimes referred to as the "Defendant".

4.   At all times material hereto, the Defendant transacted business within the Commonwealth of Massachusetts and contracted to insure persons, property, or risks within the Commonwealth of Massachusetts, all within the meaning of Massachusetts General Laws, c. 223A, §1, *et seq.*  (the Massachusetts "Long Arm Statute).

**FACTUAL BACKGROUND**

**The Plaintiffs' Underlying Claims:**

5.   The Plaintiffs' underlying claims arise out of the defective design and installation of a residential solar panel energy system (the "Solar Panels") on the Plaintiffs' house located at 4 Pineland Avenue, Millbury, Massachusetts (the "Premises").  The installer, Vivint Solar Developer, LLC ("Vivint"), is a national residential solar system provider, operating in twenty-two (22) states, with headquarters in Utah and annual sales in excess of $200 million.  The Plaintiffs are both senior citizens and rely upon social security as their primary financial support.

6.   The contract for the Solar Panels is a document drafted by Vivint and entitled "Residential Solar Energy System Purchase Agreement", dated July 22, 2017 (the "Agreement"), pursuant to which Vivint agreed to design, install, monitor and maintain the Solar Panels for the Plaintiffs' Premises.

7.   The Premises consist of a single story, wood framed house over a walkout style basement.  The Plaintiffs have owned the property since March 30, 2017.  After purchasing the Premises, the Plaintiffs began to consider installing solar panels on the roof of their house as a means of saving on their energy costs.  In early 2017, they were directly solicited by a Vivint salesperson who was conducting door-to-door sales in their neighborhood.

8.   Eventually, on July 22, 2017, the Plaintiffs entered into the Agreement, which was a detailed commercial document drafted by Vivint and presented to the Plaintiffs on a non-refundable "take-it-or-leave-it" basis.  The total purchase price for the Solar Panels was $26,404.00.

9.   Under the Agreement, Vivint made various  promises, representations and warranties, including the following:

> "We will fix or pay for any damage we may cause to your property or belongings." (Agreement, p. 1)
>
> "We warrant to you that for ten (10) years after the in-service date, (i) the System will be free from material defects in design and workmanship, and we will repair any damage to your property or other belongings that we cause . . . and (ii) *all rooftop penetrations we make in connection with installation will be watertight*." (Agreement, ¶3(e)).  (emphasis added).
>
> "We will correct any *defective workmanship* or *roof penetration* at no cost to you." (Agreement, ¶3(e)).  (emphasis added).

10.   Furthermore, Vivint represented in the Agreement that it carried commercial general liability insurance in the amount of $1 million and attached its insurance declarations page with Axis Specialty verifying the $1 million per occurrence coverage.  (Agreement, ¶3(d)).

11.   Under the Agreement, Vivint was to "design, [and] install . . . the System".  (Agreement, p. 1).  More specifically, Vivint's design and installation responsibilities were described as follows:

> "We will (i) design, install, and connect the System in material *compliance with all applicable laws;* (ii) complete all required inspections; and (iii) *obtain all required certifications and permits*".  (*See,* Agreement, ¶1(a)).  (emphasis added).

12.   In order to obtain a Building Permit for the Solar Panels, Vivint was required to provide a structural engineering report to the Town of Millbury Building Department.  Vivint maintains a staff of in-house structural engineers at its headquarters in Lehi, Utah.  One of the Vivint in-house structural engineers who was licensed in Massachusetts, prepared a structural engineering report dated July 13, 2017 (the "July 13 Report") for the Premises by which he "evaluated the structural capacity of the existing roof system to support the additional loads imposed by the solar panels".

13.     However, the Vivint engineer never actually visited the Premises.  Instead, he merely reviewed a "Site Visit / Verification Form" prepared by a Vivint representative, along with photographs of the existing roof system.  Notwithstanding his lack of personal knowledge of the Premises, the Vivint engineer opined in the July 13 Report as follows:

> "Based on the above evaluation, with appropriate panel anchors utilized, *the roof system designed on will adequately support the additional loading* imposed by the solar panels, if installed correctly".  *Id.* (emphasis added).

14.     The July 13 Report was then submitted to the Town of Millbury Building Inspector for purposes of obtaining a building permit.  The Solar Panels were then installed by Vivint on the rear slope of the roof of the Premises during September and October, 2017.

15.     However, Vivint had obtained the Building Permit without disclosing that it had discovered broken and cracked roof rafters at the Premises which required structural repairs prior to the installation of the Solar Panels.

16.     Significantly, these structural repairs made to the roof rafters were *not* disclosed or described by Vivint in the Agreement.  Furthermore, while the work was being done, Vivint *never* explained to the Plaintiffs the significance of the repair work.  Vivint *never* obtained the requisite building permit for this repair work.  Most disturbingly, these structural changes were *never* disclosed to the Building Inspector as part of the process for obtaining the permit for the Solar Panels.

17.     In September of 2018 (several months after the Solar Panels were installed), the Plaintiffs began to notice water dripping during rainstorms in the area over their bathroom and their kitchen sink; that is, in the portion of the Premises directly below the (back) roof slope where the Solar Panels had been installed.  At other times, rainwater was observed running down the interior walls on the back side of the house and the wall to the right side of the fireplace.  During these

4

instances of water intrusion, the Plaintiffs went into their attic and observed water dripping from the underside of the roof framing in the attic at various areas directly below the Solar Panels.

18.   Although Vivint was promptly notified of the leaking issues, Vivint failed and neglected to take any necessary remedial measures to address the leaks.

19.   Accordingly, in early November 2018, the Plaintiffs were forced to retain the services of a professional remediation company, ServPro, which conducted an investigation of the Premises and confirmed, through the use of infrared imaging (i.e., moisture mapping) of the wall cavities, that the rear elevation of the Premises was completely saturated.  ServPro also confirmed that based upon the amount of moisture and time that the building materials had remained wet, mold growth would be present.

20.   The existence, nature and extent of the mold contamination at the Premises has been confirmed by a microbiologist retained by the Plaintiffs.  The Plaintiffs' microbiologist found "water staining/damage" in various areas of the house and "visible mold and water damage" on the back of the drywall and wood wall framing where test holes were made.  Laboratory results from surface samples taken from the wall cavities "confirmed *elevated, abnormal mold levels* on building materials", which, "were *far above* what is expected of these same materials if they had not been exposed to moisture".

21.   The Plaintiffs' microbiologist made detailed recommendations for remediation in accordance with applicable industry standards:  "A specialized mold remediation company is needed to remove the water damaged and moldy building materials and remediate remaining materials/surfaces in all areas affected by the roof leaks."

22.   Following discovery of the roof leaks, Plaintiffs obtained a structural engineering investigation report as to the cause of the roof leaks.  The structural engineer concluded as follows:

> Moisture staining and discoloration on the roof rafters and underside of the roof decking is consistent with *water entering at various solar panel attachment points*. Moisture staining was also identified at areas of altered roof decking, where solar panel attachment would be expected. *The reported water intrusion at the west (back) roof slope was the result of inadequate flashing and/or improper installation of the solar panel attachments.*"

23. On March 11, 2019, the Plaintiffs also brought the matter to the attention of the Millbury Building Inspector. On March 12 and 13, 2019, the Building Inspector conducted an inspection of the Premises, at which time he observed numerous cracks in roof rafters, as well as evidence that the roof had begun to leak. The Building Inspector stated that he was "appalled" that Vivint would even attempt to put the Solar Panels on the roof because it was "very weak and unstable".

24. On March 13, 2019, the Building Inspector issued his Investigation Report in which he found that the Vivint construction documents which had been submitted for the building in July 2017 were "incomplete and erroneous". Specifically, the Building Inspector concluded that:

> "[T]he new roof load added (*i.e.,* the solar panel system) is overstressing the existing roof rafters and along with poor workmanship *is the most likely cause for the leakage and roof rafter damage*". (emphasis added)

25. All of the foregoing facts and events have been presented to the Defendant as part of the presentation of Plaintiffs' claims against Defendant's insured (*i.e.,* Vivint).

**The Defendant's Unfair Claim Settlement Conduct:**

26. Plaintiffs entered into the Agreement with Vivint in reliance upon Vivint's representation and assurances that, "[w]e carry general liability insurance in the amount of $1,000,000 per occurrence" with Axis Specialty, as described in the Certificate of Liability Insurance attached to the Agreement (*See,* **Exh. A** hereto).

27.   It was at all times represented and understood by Plaintiffs that the Axis Specialty coverage would insure all losses resulting from any negligence on the part of Vivint, including any defective design or installation of the Solar Panels.

28.   When Plaintiffs initiated the claim process against Vivint in the Fall of 2018, they were repeatedly advised that Vivint's insurer (*i.e.,* Axis Specialty) would cover and expeditiously handle the claim (under Axis Claim No. AXSE-0369), as evidenced by the course of communications set forth below.

29.   On December 20, 2018, Vivint's Damage Resolution Claim Manager, Kenneth Paul, advised Plaintiffs' representative that "*[d]ue to the amount of damage claimed [we] are submitting all of the information over to our insurance and they are going to be handling everything moving forward.*" Mr. Paul further represented that Vivint's insurance company (*i.e.,* Axis Specialty) "will be in contact with you *asap*".

30.   After Plaintiffs' representative requested the carrier information and claim number, Mr. Paul sent an email on January 7, 2019 stating as follows:  "*We've sent this over to our insurance. They will reach out to the customer immediately.  I've reached out to them to let them know to call immediately*".

31.   When Defendant failed to contact Plaintiffs, as promised, further inquiry was made by Plaintiffs' representative on January 10, again requesting, "Vivint's carrier information".  On January 15, 2019, Bryson Jones, Vivint's Executive Resolutions Director, emailed Plaintiffs' representative advising that "[w]e have requested that *the insurance company reach out to you*", and that, "I will be following up to ensure they do contact you . . .".

32.   When no communication was received from Vivint's carrier, Plaintiffs' representative inquired again, on January 22, January 24 and January 30, 2019 about the status of the insurance claim.  On January 31, 2019, a voicemail message was left with Plaintiffs' representative from "Mr.

Moore" at York Risk.  York Risk is the third-party claims adjustment company for Axis Specialty.
The York Risk representative advised only that Vivint had retained counsel.  No offer of settlement
was made.

33.   When there was no further communication from York Risk, Plaintiffs' representative,
once again, inquired as to the claim status.  Plaintiffs then received an email on February 21, 2019
from Mr. Jones at Vivint stating:

> "*I will follow up with the insurance company and ask that they
> reach back out to you as soon as possible.  I'll continue
> following up with you to ensure they do*."

34.   However, the insurer (*i.e.,* Axis Specialty) never reached out to Plaintiffs or to their
representative.  Instead, on February 27, 2019, Plaintiffs received notice from Attorney Christopher
J. Seusing ("Attorney Seusing") that "our firm has been retained to represent Vivint Solar with
respect to the above-referenced claim".  It was understood that Attorney Seusing had been retained
through Axis Specialty.

35.   Thereafter, Plaintiffs dealt primarily with Attorney Seusing on all matters pertaining to
the claim.  This included submission of a detailed demand package on March 28, 2019 outlining
repair and remediation damages totaling $229,789.69.

36.   In addition, Plaintiffs allowed a site visit for Attorney Seusing and his testing engineers
on April 29, 2019.  It was understood that the testing engineers had been retained by Defendant.  The
Building Inspector was also present at the site visit, at which time he advised Attorney Seusing and
his testing engineers that the roof problems were "clearly engineering oversight and neglect" .

37.   Despite submission of the detailed demand package and the site visit, Plaintiffs received
no offer of settlement from Axis Specialty.

38.    Instead, on August 5, 2019, Plaintiffs received the following email from Attorney Seusing, "I expect to be back in touch *within the next couple of weeks* with more information regarding Vivint's position."

39.    Not surprisingly, Attorney Seusing did not get "back in touch within the next couple of weeks" as promised.

40.    Accordingly, on September 10, 2019, Plaintiffs were compelled to file their arbitration complaint against Vivint, pursuant to the requirements of the Agreement that arbitration be commenced within "one (1) year after the Incident giving rise to the claim".

41.    It was subsequently learned that Defendant's testing engineers who inspected the Premises on April 29, 2019 had, in fact, confirmed that "fungal impact and conditions conducive to mold growth are present and that mold remediation is required at this property".  Yet, shockingly, this information was never disclosed by Defendant to Plaintiffs until January 25, 2020 – over eight (8) months later.

42.    At all times relevant, the Vivint representatives referenced above, together with Mr. Moore at York Risk and Attorney Seusing, were acting for, and at the direction of, Defendant as the liability carriers covering Plaintiffs' claim.

43.    On January 28, 2020, the Plaintiffs' and Defendant's representatives attended mediation before an experienced mediator agreed upon by the parties.  The mediation was scheduled for a full-day session.

44.    The Plaintiffs' claims were not settled at mediation.  In fact, Defendant's representatives walked out of the mediation hours prior to the scheduled completion of the session.  Plaintiffs contend that Defendant never had any good faith intention of resolving the Plaintiffs' claims at mediation.

45.   Thereafter on May 18, 2020, the mediator renewed his attempt at alternative dispute resolution through counsel for the parties.  The Defendant has since refused to engage in a good faith attempt to resolve Plaintiffs' claims.

46.   Defendant has failed to offer a reasonable explanation as to the basis for denying the Plaintiffs' claims and/or the basis for the Defendant's "low ball" offer of settlement.

47.   In addition, Defendant has failed to offer any plausible legal position to deny the liability of their insured, Vivint.  Instead, Defendant has relied on "facts" that are knowingly false, while ignoring the facts and law that are unfavorable to its insured.

48.   Furthermore, it is apparent that Defendant stalled and delayed any settlement negotiations for many months, with the bad faith hope and expectation that the then-unrepresented Plaintiffs would miss the one (1) year contractual limitation period to commence arbitration contained in the Agreement.

49.   In sum, Defendant has formulated and implemented unfair claim settlement strategies aimed at frustrating and improperly delaying the fair and reasonable resolution of Plaintiffs' claims, all to the financial detriment of the Plaintiffs.

50.   On February 20, 2020, Plaintiffs, by and through their counsel, sent a demand letter to Defendant pursuant to M.G.L. c. 93A.  A true and accurate copy of the demand letter (without exhibits) is attached hereto as **Exhibit B**.

51.   Defendant failed to make a reasonable settlement offer in response to the demand letter and, in fact, failed to make any response to the demand letter within the requisite thirty (30) day period.

52.   Axis eventually responded to the original 176D/93A demand by way of a letter dated July 27, 2020, from its then counsel.  However, the July 27, 2020 Axis correspondence was both untimely and inadequate as a statutory response letter.  In addition, the statements and positions set

forth by Axis in the July 27 letter evidenced the following additional unfair claim settlement practices

(a) Axis acknowledged that, from the outset, it had relied upon its insured's investigation of the Plaintiffs' claims ("Vivint already had undertaken an investigation of the Fiske's claims"). By relying on its insured's "investigation" Axis failed to satisfy the objective test for determining when an insured's liability becomes "reasonably clear". Axis should have conducted its own independent investigation, rather than relying upon the subjective and deeply flawed investigation performed by its insured.

(b) Axis stated that, "The Fiskes claimed damages are also not reasonably clear". In actuality, the Plaintiffs' damages had been clearly delineated and itemized. The remediation and repair damages totaling approximately $235,000 consisted of actual detailed estimates from the Plaintiffs' various contractors. Axis also stated that, "Axis is unaware of any legal theory upon which such damage can be recovered [for emotional distress]". In fact, it is well-established under Massachusetts law that a plaintiff can recover emotional distress damages in connection with a property damage claim. In assessing liability and damages, a reasonable insurer, acting in good faith, is obligated to investigate and understand the applicable law. Axis failed to do so.

(c) Axis also took the position that the damages claimed by the Plaintiffs "are excessive". This was not only factually erroneous, but also legally irrelevant. Under Massachusetts law, Axis is obligated to effectuate a fair and equitable settlement, regardless of the amount of the demand.

(d) Finally, nowhere in Axis' July 27 letter did Axis respond with a "tender of settlement" to the original 176D/93A demand, as is required in a response. Instead, Axis simply regurgitated an earlier "tender of settlement" made by Vivint in its March 6, 2020 response to the Plaintiffs' separate c. 93A demand to Vivint. This did not constitute a good faith tender of settlement for the Plaintiffs' claims against Axis, particularly where Axis acknowledged that this offer had already been rejected by the Plaintiffs.

53.   Notwithstanding the foregoing unfair claim settlement acts and practices, Plaintiffs, through their counsel, suggested a resumption of mediation through the same experienced mediator that had conducted the January 28, 2020 mediation.

54.   Defendant, through its representative, Attorney Seusing, agreed to a resumed mediation, but suggested an arrangement whereby the experts for the parties would present their respective positions to the mediator as to the scope and cost of remediation of the damage to the Premises. Attorney Seusing confirmed the terms of this arrangement by email dated October 2, 2020:

> "[t]he mediator would take the matter under advisement and provide us with his recommendation as to the appropriate number or range, of the remediation cost component of the Plaintiffs' claim. *Hopefully, this will then provide impetus to the parties for further negotiations*" (emphasis added).

55.   The Plaintiffs agreed to this arrangement and the resumed mediation was then conducted on October 7, 2020, in accordance with the agreed upon terms.  Following the resumed mediation, the mediator issued his recommendation/decision as to the dollar range of likely recovery for property damages.

56.   However, despite repeated attempts by the Plaintiffs to engage in settlement negotiations using the mediator's recommendation/decision as the impetus, as agreed, Defendant refused to engage in any good faith attempt to resolve Plaintiffs' claims.

57.   Instead, Defendant has continued its implementation of unfair claim settlement strategies aimed at frustrating and improperly delaying the fair and reasonable resolution of Plaintiffs' claims, to their financial detriment.

58.   On December 30, 2020, Plaintiffs, by and through their counsel, sent a supplemental notice of violation and demand letter pursuant to M.G.L. c. 93A, identifying the foregoing unfair claim settlement practices perpetrated subsequent to the original February 20, 2020 demand letter.  A true and accurate copy of this supplemental demand letter is attached hereto as **Exhibit C**.

59.   Defendant has failed, yet again, to make a reasonable settlement offer in response to the supplemental demand letter and, in fact, failed to make any response to the supplemental demand letter within the required thirty (30) day period.

## COUNT I

### PLAINTIFFS v. DEFENDANT

### (VIOLATION OF M.G.L. c.93A, §§2, 9 UNFAIR OR DECEPTIVE ACTS AND PRACTICES BASED UPON M.G.L. c.176D, §3(9) UNFAIR OR DECEPTIVE ACTS OR PRACTICES IN THE BUSINESS OF INSURANCE)

60.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 25 above and incorporates them herein by reference.

61.   The Defendant has committed unfair and deceptive acts and practices in violation of the Massachusetts Consumer Protection Act, M.G.L. c.93A, §§2, 9 including, but not limited to, the following unfair and deceptive acts or practices:

a.   misrepresenting pertinent facts and failing to disclose material information during settlement negotiations, in violation of M.G.L. c.176D, §3(9)(a);

b.   failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies, in violation of M.G.L. c.176D, §9(c);

c.   refusing to pay claims without conducting a reasonable investigation based upon all available information, in violation of M.G.L. c.176D, §9(d);

d.   failing to effectuate prompt, fair, and equitable settlement of Plaintiffs' claims where the Defendant's insureds' liability had become reasonably clear, in violation of M.G.L. c.176D, §3(9)(f);

e.   compelling insured to institute litigation/arbitration to recover amounts due under an insurance policy by offering substantially less than amounts ultimately recovered, in violation of M.G.L. c.176D, §3(9)(g);

f.   failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the fact or applicable law for denial of a claim or for the offer of a compromised settlement, in violation of M.G.L. c.176D, §3(9)(h);

g.   attempting to settle Plaintiffs' claims for less than the amount to which they reasonably would have believed they were entitled.

62.   The Defendant knew or should have known that these acts or practices were in violation of Sections 2 and 9 of the Massachusetts Consumer Protection Act, M.G.L. c.93A.

63.   The Defendant used or employed these acts or practices in willful or knowing violation of Sections 2 and 9 of the Massachusetts Consumer Protection Act, M.G.L. c.93A.

64.    As a result of the unfair and deceptive conduct of the Defendant, the Plaintiffs were

injured in that they:

   a.   were compelled to commence litigation/arbitration in order to obtain fair and equitable
        compensation for their valid claims;

   b.   have yet to receive prompt, fair, and equitable settlement of their valid claims;

   c.   incurred substantially increased attorneys' fees and litigation/arbitration expenses in their
        underlying claims;

   d.   lost the value, as measured in annual interest, of having their underlying claims settled
        fairly, equitably and/or sooner, as they should have been instead of unfairly, inequitably
        and/or later, or, not at all.

65.    The Plaintiffs are entitled to compensatory damages from the Defendant for the

damages identified herein; and the Defendant is liable to the Plaintiffs for multiple damages

predicated on the allegations set forth herein.


**COUNT II**
**PLAINTIFFS v. THE DEFENDANT**

**(VIOLATION OF M.G.L. C. 93A, §§2 AND 9 UNFAIR METHODS OF
COMPETITION AND UNFAIR OR DECEPTIVE ACTS OR PRACTICES)**

66.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 31 above

and incorporate them herein by reference.

67.    Defendant committed unfair and deceptive acts and practices in violation of the

Massachusetts Consumer Protection Act, M.G.L. c.93A, §§2, 9 as detailed above.

68.    Defendant knew or should have known that these acts or practices were in violation of

Sections 2 and 9 of the Massachusetts Consumer Protection Act, M.G.L. c.93A.

69.    Defendant used or employed these acts or practices in willful or knowing violation of

Sections 2 and 9 of the Massachusetts Consumer Protection Act, M.G.L. c.93A.

70.   As a result of the unfair and deceptive conduct of Defendant, the Plaintiffs were injured in that they:

    a.   were compelled to commence litigation/arbitration in order to obtain fair and equitable compensation for their valid claims;

    b.   have yet to receive prompt, fair, and equitable settlement of their valid claims;

    c.   incurred substantially increased attorneys' fees and litigation/arbitration expenses in their underlying claims;

    d.   lost the value, as measured in annual interest, of having their underlying claims settled fairly, equitably and/or sooner, as they should have been instead of unfairly, inequitably and/or later, or, not at all,

71.   Plaintiffs are entitled to compensatory damages from Defendant for the economic and non-economic damages identified herein; and Defendant is liable to the Plaintiffs for multiple damages predicated on the allegations set forth herein.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs seek compensatory and multiple damages against Defendant, Axis Specialty Europe, SE, for participation in the violation of M.G.L. c.93A, §§2, 9 and M.G.L. c.176D, §3(9), as detailed herein.  Plaintiffs demand judgment against Defendant as follows:

    (i)      Compensatory damages for economic and non-economic damages identified herein;

    (ii)     Damages for emotional distress;

    (iii)    Damages for aggravation, inconvenience, and frustration;

    (iv)    Multiple damages under M.G.L. c.93A, §9;

    (v)     Prejudgment interest;

    (vi)    Cost of investigation and suit;

    (vii)   Reasonable attorneys' fees; and

    (viii)  Such other relief as the Court deems equitable and just.

THE PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL COUNTS TRIABLE BY JURY.

JANICE RITZ FISKE and DAVID FISKE
by their attorneys:

/s/Kurt L. Binder
Kurt L. Binder (BBO #548621)
Noah A. Ligeti (BBO #692928)
SEDER & CHANDLER, LLP
339 Main Street
Worcester, MA 01608
(508) 757-7721
Dated: February 9, 2021                    kbinder@sederlaw.com
                                           nligeti@sederlaw.com

# EXHIBIT A

**ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

| DATE (MM/DD/YYYY) |
|---|
| 01/19/2017 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed.  If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| MARSH USA INC. | PHONE (A/C, No, Ext): | | FAX (A/C, No): |
| 1225 17TH STREET, SUITE 1300 | E-MAIL ADDRESS: | | |
| DENVER, CO 80202-5534 | | | |
| Attn: Denver.CertRequest@marsh.com \| Fax: 212-948-4381 | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Axis Specialty Europe | | |
| INSURED | INSURER B : Zurich American Insurance Company | | 16535 |
| Vivint Solar, Inc. | INSURER C : American Zurich Insurance Company | | 40142 |
| Vivint Solar Developer LLC | INSURER D : Navigators Insurance Company | | 42307 |
| Vivint Solar Provider LLC | INSURER E : | | |
| 1800 W. Ashton Blvd. | | | |
| Lehi, UT 84043 | INSURER F : | | |

## COVERAGES        CERTIFICATE NUMBER: SEA-002920134-22        REVISION NUMBER: 22

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X  COMMERCIAL GENERAL LIABILITY | | | 3776500117EN | 01/29/2017 | 11/01/2018 | EACH OCCURRENCE | $ 1,000,000 |
| | ☐ CLAIMS-MADE  X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 1,000,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | X POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 1,000,000 |
| | OTHER: | | | | | | | $ |
| B | AUTOMOBILE LIABILITY | | | BAP509801502 | 11/01/2016 | 11/01/2017 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | X ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | Comp/Coll Ded | $ 1,000 |
| A | X UMBRELLA LIAB  X OCCUR | | | 3776500217EN | 01/29/2017 | 11/01/2018 | EACH OCCURRENCE | $ 5,000,000 |
| | X EXCESS LIAB ☐ CLAIMS-MADE | | | GL Only | | | AGGREGATE | $ 5,000,000 |
| | ☐ DED ☐ RETENTION $ | | | | | | | $ |
| C | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY                    Y/N | | | WC509801302 | 11/01/2016 | 11/01/2017 | X PER STATUTE ☐ OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?    N N/A | | | AZ, CA, CT, FL, HI, MA, MD, NJ, | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | (Mandatory in NH) | | | NM, NY, PA, SC, TX, UT | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| B | If yes, describe under DESCRIPTION OF OPERATIONS below | | | WC509801402 (MA) | 11/01/2016 | 11/01/2017 | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| D | EXCESS LIABILITY | | | GA16EXC888919IV | 11/01/2016 | 11/01/2017 | EACH OCCURRENCE | $5,000,000 |
| | AUTO/EL ONLY | | | | | | AGGREGATE | $5,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES  (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Evidence of Insurance Only

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Vivint Solar, Inc. | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| Vivint Solar Developer LLC | |
| Vivint Solar Provider LLC | |
| 1800 W Ashton Blvd | |
| Lehi, UT  84043 | AUTHORIZED REPRESENTATIVE of Marsh USA Inc. |
| | Kathleen M. Parsloe        *Kathleen M. Parsloe* |

© 1988-2014 ACORD CORPORATION.  All rights reserved.

ACORD 25 (2014/01)        The ACORD name and logo are registered marks of ACORD

Copyright © 2017 Vivint Solar Developer, LLC.  All Rights Reserved.        SPA *(4/2017, v3.2.7)* | Exhibit C

# EXHIBIT B



**KURT L. BINDER**
PHONE:   (508) 757-7721 EXT. 103
FAX:      (508) 798-1863
kbinder@sederlaw.com

February 20, 2020

**VIA FEDERAL EXPRESS**
Helen O'Sullivan, CEO
Axis Specialty Europe, SE
34 Upper Mount Street
Dublin 2, Ireland  D02FT72

**VIA FEDERAL EXPRESS**
Axis Specialty Europe, SE
c/o Axis Specialty U.S. Services, Inc.
11680 Great Oaks Way, Suite 500
Alpharetta, GA  30022
Attention:  Carlton W. Maner, President

RE:    Claimants:          David Fiske and Janice Fiske
       Your Insured:       Vivint Solar Developer, LLC
       Axis Policy No.:    3776500117 EN
       Axis Claim No.:     AXSE-0369

**Notice of Violation and Demand for Relief**
**Pursuant to G.L. c. 176D and c. 93A**

Dear Madam/Sir,

This letter is being sent pursuant to the provisions of Massachusetts General Laws, Chapters 176D and 93A.  This office represents David Fiske and Janice Fiske (collectively, the "Fiskes") in connection with their claims against Vivint Solar Developer, LLC ("Vivint").

The Fiskes' claims arise out of the defective and negligent design and installation of a residential solar panel energy system (the "Solar Panels") on the Fiskes' house located at 4 Pineland Avenue, Millbury, Massachusetts (the "Premises").  The installer, Vivint, is a national residential solar system provider, operating in twenty-two (22) states, with headquarters in Utah and annual sales in excess of $200 million.  The Fiskes are both senior citizens and rely upon social security as their primary financial support.



SEDERLAW
ATTORNEYS | Est. 1918

Axis Specialty Europe, SE
February 20, 2020
Page 2


Axis Specialty Europe ("Axis") insured Vivint under a commercial general liability policy (Policy No. 3776500117 EN) with primary coverage limits of $1,000,000.00 per occurrence. A copy of the Certificate of Liability Insurance evidencing this coverage is attached hereto as **Exhibit A**.

## I.      THE FISKES' CLAIMS AGAINST VIVINT

The facts relating to the Fiskes' claim against Vivint have been set forth in detail in the fourteen (14) page demand letter dated February 6, 2020, which was sent to Vivint, a copy of which is attached hereto as **Exhibit B** (the "Vivint Demand Letter"). The Vivint Demand Letter outlines the factual and legal basis for imposing liability against Vivint for the damages arising out of the defective design and installation of the Solar Panels. Together with the Vivint Demand Letter, we provided numerous documents in support of the facts and claims set forth in that letter, all of which were included in an "Appendix of Exhibits" (the "Appendix"), a copy of which is also enclosed for your review and consideration.

The Fiskes entered into the Agreement with Vivint in reliance upon Vivint's representation and assurances that, "[w]e carry general liability insurance in the amount of $1,000,000 per occurrence" with Axis, as described in the Certificate of Liability Insurance attached to the Agreement (Agreement, ¶3(d), App. Exh. A). It was at all times represented and understood by the Fiskes that the Axis coverage would insure all losses resulting from any negligence on the part of Vivint, including any defective design or installation of the Solar Panels.

Indeed, when the Fiskes initiated the claim process against Vivint in the Fall of 2018, they were repeatedly advised that Vivint's insurer (*i.e.,* Axis) would expeditiously handle the claim, as evidenced by the following communications:

- On December 20, 2018, Vivint's Damage Resolution Claim Manager, Kenneth Paul, advised the Fiskes' representative that "*[d]ue to the amount of damage claimed [we] are submitting all of the information over to our insurance and they are going to be handling everything moving forward.*" Mr. Paul further represented that Vivint's insurance company "will be in contact with you *asap*".

- After the Fiskes' representative requested he carrier information and claim number to follow up, Mr. Paul sent an email on January 7, 2019 stating as follows: "*We've sent this over to our insurance. They will reach out to the customer immediately. I've reached out to them to let them know to call immediately*".


SEDERLAW
ATTORNEYS | Est. 1918

Axis Specialty Europe, SE
February 20, 2020
Page 3

- When Axis failed to contact the Fiskes, as promised, further inquiry was made by the Fiskes' representative on January 10 again requesting "Vivint's carrier information". On January 15, 2019, Bryson Jones, Vivint's Executive Resolutions Director, emailed the Fiskes' representative advising that "[w]e have requested that *the insurance company reach out to you*", and that, "I will be following up to ensure they do contact you . . .".

- When no communication was received from Vivint's carrier, the Fiskes' representative inquired again, on January 22, January 24 and January 30, 2019 about the status of the insurance claim. On January 31, 2019, a voicemail message was left with the Fiskes' representative from "Mr. Moore" at York Risk (Axis' third-party claims adjuster) advising only that Vivint had retained counsel. No offer of settlement was made.

- When there was no further communication from York Risk, the Fiskes' representative, once again, inquired as to the claim status. He received an email on February 21, 2019 from Mr. Jones at Vivint stating:

  > "*I will follow up with the insurance company and ask that they reach back out to you as soon as possible. I'll continue following up with you to ensure they do.*"

- However, the insurer (*i.e.,* Axis) never reached out to the Fiskes or their representative. Instead, on February 27, 2019, the Fiskes received notice from Attorney Christopher J. Seusing that "our firm has been retained to represent Vivint Solar with respect to the above-referenced claim". It was understood that Attorney Seusing had been retained through Axis.

- Thereafter, the Fiskes dealt exclusively with Vivint's counsel on all matters pertaining to the claim. This included submission of a detailed demand package on March 28, 2019 outlining repair and remediation damages totaling $229,789.69. The Fiskes also allowed a site visit for Attorney Seusing and his testing engineers on April 29, 2019. Despite submission of the detailed demand package and the site visit, the Fiskes received no offer of settlement from Axis or Vivint.

- Instead, on August 5, 2019, the Fiskes received the following email from Attorney Seusing:



Axis Specialty Europe, SE
February 20, 2020
Page 4

> "I expect to be back in touch *within the next couple of weeks* with more information regarding Vivint's position."

Not surprisingly, Attorney Seusing did not get "back in touch within the next couple of weeks" as promised.

- Accordingly, on September 10, 2019, the Fiskes were compelled to file their arbitration complaint against Vivint, pursuant to the requirements of the Agreement that arbitration be commenced within "one (1) year after the Incident giving rise to the claim". (Agreement, ¶6(a), App. Exh. A).

- It was subsequently learned that the mold testing engineers had, in fact, confirmed that "fungal impact and conditions conducive to mold growth are present and that mold remediation is required at this property". Yet, shockingly, this information was never disclosed by Axis to the Fiskes until January 25, 2020 – over eight (8) months later.

At all times relevant, the Vivint representatives referenced above, together with Mr. Moore at York Risk and Attorney Seusing, were acting for, and at the direction of, Axis as the liability carrier covering the Fiskes' claim.

## II.    THE REQUIREMENTS IMPOSED BY G.L. C.176D AND C.93A

Massachusetts General Laws, c.176D, §3 bans "unfair or deceptive acts or practices in the business of insurance," which include "unfair claim settlement practice[s]". G.L. c.176D, §3(9). Those claiming injury by virtue of an insurance practice prohibited by G.L. c.176D, §3(9) may sue under G.L. c.93A. *Bodden v. O'Connor Café of Worcester, Inc.*, 50 Mass. App. Ct. 56, 59 (2000) and cases cited.

Under G.L. c.176D, §3(9), the following constitute "unfair claim settlement practice[s]":

"(c) failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

(d) refusing to pay claims without conducting a reasonable investigation based upon all available information;

(f) failing to effectuate prompt, fair, and equitable settlement of claims in which liability has become reasonably clear;


SEDERLAW
ATTORNEYS | Est. 1918

Axis Specialty Europe, SE
February 20, 2020
Page 5

    (g)  compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than amounts ultimately recovered;

    (h)  failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromised settlement."

These provisions have been extensively interpreted and enforced by the Massachusetts courts as described below.

The courts have held that General Laws, c.176D, §3(9) and G.L. c.93A "protect[s] the interests of both claimants and insureds against unfair claim settlement practices." *Gore v. Arbella Mut. Ins. Co.*, 77 Mass. App. 518, 525 (2010). With respect to claimants, G.L. c.176D, §3(9) was "enacted to encourage the settlement of insurance claims … and discourage insurers from forcing claimants into unnecessary litigation to obtain relief." *Clegg v. Butler*, 424 Mass. 413, 419 (1997). These provisions aim to "deal with the conduct of some insurers that stymied those with bona fide claims from obtaining fair settlements in a reasonably prompt time." *Hopkins v. Liberty Mutual Ins. Co.*, 434 Mass. 556, 562 (2001). G.L. c.176D, §3(9)(g), in particular, "express[es] a legislative purpose to penalize the practice of 'low balling,' i.e., offering much less than a case is worth in a situation where liability is either clear or highly likely." *Guity v. Commerce Ins. Co.*, 36 Mass. App. Ct. 339, 343 (1994).

In order to determine when an insured's liability becomes "reasonably clear" an objective test is used by the courts: "whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insure[d] was liable to the plaintiff." *O'Leary-Alison v. Metropolitan Prop. & Cas.*, 52 Mass.App.Ct. 214, 217 (2001). Only a "plausible, reasoned legal position" will be deemed outside the scope of the punitive aspect of the combined application of c.93A and c.176D. *Guity, supra*, at 343.

An insurer violates the statutes by failing to conduct "a reasonable investigation based upon all available evidence." G.L. c.176D, §3(9)(d). Among other possible ways, an insurer violates this provision by "purposefully and strategically" failing to pursue a line of inquiry because it would be unfavorable to the defense. *See, Scott v. Vermont Mut. Ins. Co.*, 2011 WL 4436984, at *13 (D. Mass 2011) (*citing, Martinez-Rivera v. Commerce Ins. Co.*, 2011 WL 3276684, at *8 (Mass. Super. Ct. 2011)). Thus, violations have been found where an insurer "repeatedly failed to take advantage of and to consider objectively the readily available evidence of the occurrence." *Sterlin v. Commerce Ins. Co.*, 2009 WL 323455 at *8 (Mass. Super. Ct. 2009) (involving failure to give credence to Trooper's statement in State Police Report and failure to take photographs into consideration).



SEDERLAW
ATTORNEYS | Est. 1918

Axis Specialty Europe, SE
February 20, 2020
Page 6

The statutory scheme also recognizes that encouraging the prompt settlement of claims protects the insured. "The insurer has a duty to its insured. If it does not fulfill that duty, it may violate G.L. c.176D, §3(9), and be liable to its insured." *Lazaris v. Metropolitan Property & Cas. Ins. Co.*, 428 Mass. 502, 506 (1998). Thus, "[w]hen an insurer unfairly fails to settle, the interests of the injured party and the insured may align." *Gore v. Arbella Mutual Ins. Co.*, 77 Mass. App. at 526. "[I]f the insurer violated the law in failing to settle for the policy limits, then the insurer will be liable to the insured for the damages exceeding the policy limit." *Id.*

Lastly, Massachusetts has recently made it clear that the consequences of an insurer's failure to effectuate a prompt settlement, as required by G.L. c.176D, will result in a doubling or trebling of the amount of the underlying judgment. *See, Rhodes v. AIG Domestic Claims, Inc.*, 461 Mass. 486, 504 (2012) ("The statute puts insurers on notice that if they willfully fail to effectuate settlement on a case with high potential for a large judgment at trial they are liable for up to treble damages based on that judgment amount").

## III.    VIOLATIONS OF G.L. C.176D AND C.93A BY AXIS

It is our position that Axis has engaged in practices prohibited by G.L. c.176D, §3(9), and, hence, has violated G.L. c.93A.  In addition, we believe that the actions and conduct of Axis in this matter may be sufficiently unfair and deceptive as to constitute an independent violation of the provisions of G.L. c. 93A, §§2 and 9.[1]

First and foremost, Axis has blatantly violated its obligations to (1) conduct a prompt and reasonable investigation of the Fiskes' claims and (2) effectuate a prompt, fair and equitable settlement of the Fiskes' claims.  According to Vivint's representatives, the Fiskes' claims were submitted to Axis as early as December 20, 2018, with repeated assurances that Axis "will be handling everything moving forward" and that Axis "will be in contact with you asap" and will "reach out to you immediately".  Then later, in February 2019, the Fiskes were again assured that the insurance company will "reach back to you as soon as possible".

Notwithstanding these repeated assurances, Axis completely failed to promptly investigate the Fiskes' claim – as evidenced by the very fact that the Fiskes were never contacted by Axis to investigate the claim, other than a single voicemail message from Mr. Moore at York Risk.  There was no follow-up communication from Mr. Moore, written or verbal, nor were the Fiskes provided with a claim number.  Furthermore, although Vivint's liability was reasonably clear from the outset

---

[1] As an insurer who contracted to insure persons and property at risk within Massachusetts, Axis is subject to compliance with these statutes.  Furthermore, Axis is licensed with the Massachusetts Division of Insurance under NAIC #14927.



Axis Specialty Europe, SE
February 20, 2020
Page 7

(as described in the Vivint Demand Letter), there was no effort by Axis to make a prompt, fair and equitable settlement of the Fiskes' claim.

To the contrary, both Axis and Vivint embarked on a scheme to delay, hinder and stall the adjustment of the Fiskes' claim. It is now apparent that Axis and Vivint had a plan to stall settlement negotiations with the bad faith hope and expectation that the, then unrepresented, Fiskes would miss the one (1) year contractual limitation period to commence arbitration contained in the Agreement. Such underhanded conduct is certainly worthy of condemnation under c. 176D and 93A.

Furthermore, Axis has failed to offer a reasonable explanation, or any explanation for that matter, as to the basis for denying the Fiskes' claim. To the extent Axis denies liability of its insured, such denial is in bad faith. Under the objective test, any reasonable person with knowledge of the relevant facts and law (as described in the Vivint Demand Letter and accompanying Appendix) would conclude that Vivint is liable to the Fiskes for its negligent and defective design and installation of the Solar Panels. Axis has failed to offer any plausible, reasoned legal position to deny liability.[2]

Lastly, Axis has violated the statute by compelling the Fiskes to commence arbitration in order to recover amounts due under an insurance policy that was specifically described in the Agreement, as providing coverage for Vivint's obligations.

## IV.    DEMAND FOR RELIEF

Notwithstanding the foregoing, and without waiving any arguments or claims of the Fiskes, on behalf of our clients, we are authorized to settle all claims against Vivint for the sum of **Four Hundred Seventy-Five Thousand ($475,000.00) Dollars**. In exchange, the Fiskes will provide a full and complete release of all claims against Vivint.[3]

Pursuant to Massachusetts General Laws, Chapter 93A, you have thirty (30) days to respond to this demand letter. If you fail to respond appropriately, then our clients will have the right to pursue a legal action against Axis seeking redress for the statutory violations described herein. Please be advised that under the rule articulated by the Massachusetts Supreme Judicial Court in *Rhodes v. AIG Domestic Claims, Inc., supra*, your failure to effectuate a fair and

---

[2] The "defenses" which have been articulated by Vivint are factually implausible. For example, Vivint has stated that the roof leaks were due to "there only being one layer of shingles" on the roof when, in fact, Vivint's own report identifies "two layers of composite shingle roofing". (*See,* App. Exh. D).

[3] Should the case fail to settle, then the exposure to Axis' insured is substantial. The damage award may likely exceed the total policy limits, based upon the facts of this case and the strong possibility of either double, or treble, damages based upon Vivint's numerous violations of safety statutes and regulations, as described in the Vivint Demand Letter.



Axis Specialty Europe, SE
February 20, 2020
Page 8

equitable settlement of this case may expose Axis to direct liability for up to three times the amount of the award which will inevitably issue against Vivint in favor of our clients.

We hereby reserve all other legal rights and remedies, including the right to rely upon and assert other facts and grounds that are, or may become, available to us.

Please address your responses to the undersigned within the thirty (30) day statutory time period.

Very truly yours,

Kurt L. Binder

KLB/lco
Enclosures

cc:     Chris Moore, National General Adjuster
        York Risk Services Group

# EXHIBIT C



**KURT L. BINDER**
PHONE:  (508) 757-7721 EXT. 103
FAX:      (508) 798-1863
kbinder@sederlaw.com

December 30, 2020

**VIA E-MAIL:** helen.osullivan@axiscapital.com
**FEDERAL EXPRESS**
Helen O'Sullivan, CEO
Axis Specialty Europe, SE
34 Upper Mount Street
Dublin 2, Ireland  D02FT72

RE:   Claimants:          David Fiske and Janice Fiske
       Your Insured:       Vivint Solar Developer, LLC
       Axis Policy No.:     3776500117 EN
       Axis Claim No.:      AXSE-0369

**SUPPLEMENTAL NOTICE OF VIOLATION AND DEMAND FOR RELIEF
PURSUANT TO G.L. c. 176D AND c. 93A**

Dear Madam,

This letter is being sent pursuant to the provisions of Massachusetts General Laws, Chapters 176D and 93A which together govern unfair and deceptive acts or practices in the business of insurance, including unfair claim settlement practices. This office represents David Fiske and Janice Fiske (collectively, the "Fiskes") in connection with their claims against Axis Specialty Europe, SE ("Axis") and its insured, Vivint Solar Developer, LLC ("Vivint").

This letter should be considered as a *supplemental notice* supplementing the Fiskes' original Notice of Violation and Demand for Relief Pursuant to G.L. c. 176D and c. 93A sent to Axis on February 20, 2020 (the "Original 176D/93A Demand"). The facts, authorities and definitional terms set forth in the Original 176D/93A Demand are incorporated herein by reference.

The Fiskes' claims arise out of the defective and negligent design and installation of a residential solar panel energy system (the "Solar Panels") on the Fiskes' house located at 4 Pineland Avenue, Millbury, Massachusetts (the "Premises"). The installer, Vivint, is a national residential solar system provider, operating in twenty-two (22) states, with headquarters in Utah and recently valued at $3.2 billion. The Fiskes are both senior citizens and rely upon social security as their primary financial support.



Axis Specialty Europe, SE
December 30, 2020
Page 2

Axis insured Vivint under a commercial general liability policy (Policy No. 3776500117 EN) with primary coverage limits of $1,000,000.00 per occurrence. A copy of the Certificate of Liability Insurance evidencing this coverage is attached hereto as **Exhibit A**.

## I.   ORIGINAL 176D/93A DEMAND

The facts and authorities relating to the Fiskes' claim against Axis were set forth in detail in the Original 176D/93A Demand which, in turn, attached a copy of the Fiskes' fourteen (14) page demand letter dated February 6, 2020, sent to Vivint (the "Vivint Demand Letter"). The Vivint Demand Letter outlined the factual and legal basis for imposing liability against Vivint, together with the supporting "Appendix of Exhibits", a copy of which was also included with the Original 176D/93A Demand.

Chapter 93A requires a written response within thirty (30) days of its mailing or delivery. Failure to respond to a 93A demand letter within thirty (30) days will permit an inference of knowing and intentional misconduct warranting multiple damages. *See, Slaney v. Westwood Auto, Inc.*, 366 Mass. 688 (1975).

The Original 176D/93A Demand was sent to Axis headquarters and received by Axis on February 24, 2020. A timely response should have been sent no later than March 24, 2020. Axis failed to respond by that date; hence, there is now an inference of knowing and willful misconduct by Axis warranting multiple damages.

## II.   FURTHER VIOLATIONS OF G.L. C. 176D AND C. 93A BY AXIS

This supplemental demand letter is now being sent because subsequent to the Original 176D/93A Demand, Axis has committed additional unfair claim settlement practices in further violation of these statutes.[1]  These additional violations are described below.

### A.  Axis' July 27, 2020 Response Letter Evidences Additional Unfair Claim Settlement Practices.

Axis eventually responded to the Original 176D/93A Demand by way of a letter dated July 27, 2020, from its then counsel, Spencer Schneider of the law firm of Berman, Berman, Berman, Schneider & Lowary, LLP. The July 27, 2020 Axis correspondence  was both untimely

---

[1] Axis is subject to compliance with these statutes as an insurer that contracted to insure persons and property within the Commonwealth of Massachusetts. Furthermore, Axis is licensed with the Massachusetts Division of Insurance under NAIC #14927.



Axis Specialty Europe, SE
December 30, 2020
Page 3

and inadequate as a statutory response letter.  In addition, the July 27 letter evidenced the following additional unfair claim settlement practices on the part of Axis:

1.  <u>Unreasonable and Non-Objective Investigation of Liability</u>.  In Axis' July 27 response, Axis acknowledged that, from the outset, it had relied upon its insured's investigation of the Fiskes' claims ("Vivint already had undertaken an investigation of the Fiske's claims").  By relying on its insured's "investigation" Axis failed to satisfy the objective test for determining when an insured's liability becomes "reasonably clear".  Axis should have conducted its own independent investigation, rather than relying upon the subjective and deeply flawed investigation performed by its insured.  *See, Sterlin v. Commerce Ins. Co.*, 25 Mass. L. Rptr. 124 (Worcester Sup. Ct., 2009) (insurer violation of c. 176D by investigation that was "misleading and blind to the evidence and factual material that was available").

For example, Axis stated in its July 27 response that, "[t]he Vivint representative concluded that nail pops and holes from nails used to install roof shingles were most likely the cause of the roof leaks", referring to a December 6, 2018 email from Vivint stating that the leaks were due to "nails lifting and there being only *one layer* of shingles".  However, this statement was patently false.  Vivint's own July 17, 2017 structural engineering report filed with the Millbury Building Inspector noted that the roof had "*two layers* of composite shingle roofing".

Moreover, the "nail pops and holes from nails" were clearly caused by the overstressing  and cracking of the cracked roof rafters from the crushing weight of the Solar Panels – which should never have been installed on the house.  This is not only common sense, but also the conclusion reached by the Millbury Building Inspector in his March 13, 2019 investigation report:  "The new roof load added (*i.e.,* the solar panel system) is overstressing the existing roof rafters and along with poor workmanship is the *most likely cause for the leakage and roof rafter damage*".

Thus, the "nail pops and holes" to which Axis made reference are actually an indictment of its insured, rather than a defense to liability.  Had Axis conducted its own, objective investigation, it would have discovered the knowing falsification of facts by Vivint (*i.e.,* stating one layer of shingles when there were actually two layers).  Had Axis conducted its own investigation of the Millbury Building Inspector's extensive investigation, including public record reports and conclusions, it would have discovered that the true cause of the leakage and roof damage was Vivint's faulty design and poor workmanship.



Axis Specialty Europe, SE
December 30, 2020
Page 4

Similarly, in the July 27 response, Axis appears to have adopted wholesale Vivint's position that the home inspector who was hired by the Fiskes to inspect the Premises on March 30, 2017, prior to their purchase, had "concluded that areas of the Fiske home exhibited evidence of water damage and other areas posed a risk for future water invasion"". However, if Axis had actually read the home inspection report, it would have seen that (1) the inspector was referring to "hairline . . . foundation cracks" as the items which "pose a risk of water leaking into the structure" – not the roof area, and (2) there were very small ceiling stains near the chimney on the left side of the house and on the front porch, both noted as "marginal" and nowhere near the areas of massive water damage beneath the rear roof of the house where the Solar Panels were installed. Moreover, Axis would have noted that the inspector found the attic area to be "acceptable" with "no signs of leaks" or moisture penetration. Instead, Axis chose to rely upon the subjective, flawed investigation of its insured.

2. <u>Unreasonable Rejection of Clear Damages</u>. In Axis' July 27 response, it stated that, "The Fiskes claimed damages are also not reasonably clear". In actuality, the Fiskes' damages had been clearly delineated and itemized. The remediation and repair damages totaling approximately $235,000 consist of actual detailed estimates from the Fiskes' various contractors, including demolition and mold treatment from Servpro, HVAC removal, and reinstallation work from the HVAC contractor, and mold testing and clearance inspections from the microbiologist, Gordon Mycology. The primary component of these damages is the $178,000 reconstruction cost estimate prepared by the Fiskes' licensed public adjuster, Mario Dies.

Axis' then suggested that Mr. Dies' estimate was somehow deficient because he is not a licensed contractor or engineer. This position is absurd. Mr. Dies has over thirty (30) years of experience in assessing, estimating and supervising property remediation and repairs. Most of his experience was as a Senior Property Field Adjuster with a major insurance carrier. Furthermore, Mr. Dies' estimate was prepared using the industry standard methodology involving the software program, "Xactimate". All of these facts were made known to Axis. By contrast, Vivint's expert (*i.e.*, J.S. Held) chose to ignore the industry standard and, instead, utilized an unreliable methodology which ignored the full scope and extent of the water infiltration damages.

3. <u>Axis Ignored Clear Law Regarding Emotional Distress Damages</u>. With respect to the Fiskes' claims for emotional distress damages, in Axis' July 27 response, it stated that, "Axis is unaware of any legal theory upon which such damage can be recovered". In fact, it is well-established under Massachusetts law that a plaintiff can recover emotional distress damages in connection with a property damage claim. *See, e.g., Sullivan v. Boston Gas Co.*, 414



Axis Specialty Europe, SE
December 30, 2020
Page 5

Mass. 129 (1993). In *Sullivan*, the husband and wife plaintiffs witnessed a natural gas explosion of their home, from which they suffered emotional distress. The Massachusetts Supreme Judicial Court concluded that where, "both plaintiffs produce sufficient objective evidence of physical manifestation of mental distress", together with "expert medical opinion linking their symptoms to the explosion", emotional distress damages are recoverable. *Id.* at 139-140.

In assessing liability and damages, a reasonable insurer, acting in good faith, is obligated to investigate and understand the applicable law. In this case, the Agreement between Vivint and the Fiskes provided that it would be governed by Massachusetts law. Axis was obligated to assess the case under applicable law and, thus, violated c. 176D by choosing to remain "unaware" of Massachusetts law. *Home Indem. Ins. Co. v. Merchants Distributors, Inc.*, 19 Mass. App. Ct. 20, 24 (1984) (good faith requires insurer to investigate liability and damage "upon which an intelligent decision may be based").

In this case, both of the Fiskes suffered severe emotional distress involving numerous physical symptoms, all of which are medically linked to their nightmare of living in a leaking, structurally impaired, water damaged, mold infested house while encountering the broken promises, changed positions and frivolous defenses of the responsible parties (*i.e.,* Vivint and Axis). Mr. Fiske was treated for adjustment disorder with anxiety as a result of these living conditions, and suffered from panic attacks, headaches, stomach issues and nightmares (involving the roof collapsing), for which he was prescribed anti-anxiety medication. Mrs. Fiske suffered similar symptoms, which were heightened by the mold exposure, because of the exacerbation of her asthma condition.

4. <u>The Fiskes' Demand Amount is Not Relevant to Axis' Obligations</u>. In the July 27 letter, Axis made the excuse that the damages claimed by my clients "are excessive". This is not only factually erroneous, but also legally irrelevant. Under Massachusetts law, Axis is obligated to effectuate a fair and equitable settlement, regardless of the amount of the demand. *See, Bobick v. United States Fid. & Guar. Co.*, 439 Mass. 652, 662 (2003) ("even excessive demands on the part of the claimant . . . do not relieve the insurer to extend a prompt and equitable offer of settlement").

5. <u>No Tender of Settlement</u>. Finally, I would note that nowhere in Axis' July 27 letter did Axis respond with a "tender of settlement" to the Original 176D/93A Demand, as is required in a response. Instead, Axis simply regurgitated the "tender of settlement" in the amount of $50,000.00 made by Vivint in its March 6, 2020 response to our separate c. 93A demand to Vivint. This did not constitute a good faith tender of settlement for the Fiskes' claims against



Axis Specialty Europe, SE
December 30, 2020
Page 6

Axis, particularly where Axis acknowledged that this offer had already been rejected by my clients.

**B. Axis' Claim Settlement Conduct in Connection with the Resumed Mediation Evidences Additional Unfair Claim Settlement Practices.**

By letter dated July 31, 2020, the Fiskes responded to Axis' July 27 letter with a suggestion that continued settlement discussion should be resumed with the mediator who had earlier conducted the mediation of the case, David ("Tack") Burbank of Burbank Mediation Services (hereinafter, "Mediator Burbank"). By this letter, the Fiskes also informed Axis of the following two (2) significant developments:

- First, that on July 21, 2020, the Fiskes had filed suit in Worcester Superior Court against Axis in civil action number 2085CV00758 for its violations of G.L. c. 93A and c. 176D. A copy of the Complaint in the said action was included with the July 31, 2020 letter to Attorney Schneider.

- Secondly, Axis was informed that the claims against Vivint were then the subject of an arbitration proceeding before the Hon. Paul Troy (ret.) in JAMS arbitration case number 140-001-8073. Axis was further informed that on July 24, 2020, Judge Troy issued a seven (7) page decision, by which he found that (1) the Fiskes were not precluded by the limitation of liability provision in their agreement with Vivint from pursuing their remedies against Vivint under c. 93A, §9, including multiple damages and attorneys' fees; (2) that the building code violations by Vivint in the design and installation of the solar panels gave rise to *per se* c. 93A liability; and (3) that the consumer breach of warranty claims against Vivint also gave rise to *per se* c. 93A liability. This decision significantly increased the scope of damages against Axis' insured. A copy of the decision was included with the July 31 letter.

On September 10, 2020, counsel for Vivint, retained through Axis, Attorney Christopher J. Seusing ("Attorney Seusing") responded by agreeing to a resumed mediation before Mediator Burbank, at which the respective experts could present their positions as to the scope and cost of remediation of the Fiskes' Premises. This arrangement was then formalized by email from Attorney Seusing, dated October 2, 2020:

> "Tack [Burbank] would take the matter under advisement and provide
> us with his recommendation as to the appropriate number or range, of
> the remediation cost component of the Fiskes' claims. *Hopefully, this*



Axis Specialty Europe, SE
December 30, 2020
Page 7

> *will then provide impetus to the parties for further negotiations*".
> (emphasis added)

The resumed mediation session was thereafter scheduled and conducted on October 7, 2020. The Fiskes were anxious to resume the mediation as soon as possible because of the ongoing water/mold issues and associated health hazards in their home. Furthermore, in order to quickly move to the resumed mediation, the Fiskes agreed, in good faith, to suspend any further activity in both their pending Arbitration and the pending Worcester Superior Court lawsuit against Axis.

At the resumed mediation, the Fiskes and Vivint/Axis made their respective presentations to Mediator Burbank as to the scope and cost of the remediation of the damages to the Premises. Also in attendance throughout the resumed mediation was new counsel for Axis, Attorney Gregg Bailey of the law firm Cetrulo, LLP ("Attorney Bailey"). At the conclusion of the resumed mediation, Mediator Burbank took the matter under advisement. On November 12, 2020, he issued his written recommendation-decision concluding, in relevant part, as follows:

> "This email constitutes my report regarding damages in the above captioned case. *As requested, I am providing ranges of what I believe to be likely arbitration awards*. The high end of the range assumes that the front (East) side of the Plaintiffs' house requires extensive work while the low end of the range assumes that it does not. . . . I have approached this undertaking as if I were the arbitrator (FYI I have served as an arbitrator in approximately 1,500 cases over the past 25 years). *The low end of the range represents damages that, as an arbitrator, I would conclude have been conclusively established by the Plaintiffs. The high end is supported by competent but not necessarily convincing evidence, and represents the realistic best day for the Plaintiffs. . . .*
>
> In my opinion *the high end of the Plaintiffs' likely recovery for property damage (I have not addressed claims for personal injury or emotional distress or anything else) is approximately $225,000 and the low end is approximately $140,000...*" (emphasis added).[2]

---

[2] Mediator Burbank also foreclosed any question that the water damage to the Premises had been caused by Vivint ("Preliminarily, in arriving at my estimates, I have concluded that *the solar panel installation by Vivint caused the water infiltration . . .* ).



Axis Specialty Europe, SE
December 30, 2020
Page 8

Following Mediator Burbank's recommended range of $140,000 to $225,000 for the property damage component, the Fiskes attempted to resume further negotiations through him as to a global settlement. This was the agreed upon course of action based upon Attorney Seusing's October 2 written assurance that Mediator Burbank's recommendation "*will then provide impetus to the parties for further negotiation*". However, notwithstanding Mediator Burbank's recommendations and attempts to engage Vivint/Axis in further negotiations, there has been no new settlement proposal from Vivint/Axis as to a global resolution of all claims.

The above-referenced conduct on the part of Axis evidences additional violations of its obligations under G.L. c. 176D, §3(9) and G.L. c. 93A, including its "failing to effectuate prompt and equitable settlement of claims in which liability has become reasonably clear". Although we contend that Vivint 's liability was "reasonably clear" from the outset of this claim, the above-referenced rulings of the Arbitrator (*i.e.,* Judge Troy) and now the decision-recommendation of Mediator Burbank, definitively establish that liability is reasonably clear. Yet, Axis refuses and fails to promptly effectuate a fair and equitable settlement. Instead, Axis is continuing its bad faith scheme to delay, hinder and stall the fair and equitable settlement of the Fiskes' claim.

## III.   DEMAND FOR RELIEF

Although the above-referenced additional violations impose greater liability and damages upon Axis arising out of the ongoing delays and damages to the Fiskes and their home, the Fiskes remain willing to settle all claims for the sum stated in the Original 176D/93A Demand; namely, **Four Hundred and Seventy-Five Thousand ($475,000.00) Dollars**.

Pursuant to Massachusetts General laws, Chapter 93A, Axis has thirty (30) days to respond to this demand letter. If you fail to respond appropriately, then we will amend our Complaint in the pending Worcester Superior Court action against Axis, in order to include this supplemental demand letter, as well as the actions and conduct of Axis described herein.

Please be advised that under the rule articulated by the Massachusetts Supreme Judicial Court in *Rhodes v. AIG Domestic Claims, Inc.*, 461 Mass. 486, 504 (2012), your failure to effectuate a fair and equitable settlement of this case may expose Axis to direct liability for up to three times the amount of the award which will inevitably issue against Vivint.

We hereby reserve all other legal rights and remedies, including the right to rely upon and assert other facts and grounds that are, or may become, available to us.



Axis Specialty Europe, SE
December 30, 2020
Page 9


       Please address your responses to the undersigned within the thirty (30) day statutory time period.


                                   Very truly yours,

                                   Kurt L. Binder

KLB/lco
Enclosures

cc:    David and Janice Fiske
       Gregg Bailey, Esq. - via email:  GBailey@cetllp.com